KRUEGER CORP.

v.

DETROIT TRUST CO.

No. 11836.

United States Court of Appeals, Sixth Circuit.

Feb. 10, 1954.

Arthur E. Fixel, Detroit, Mich., Fixel & Fixel, Detroit, Mich., on the brief, for appellant.

Joseph S. Radom, Detroit, Mich., Kenney, Radom & Rockwell, Detroit, Mich., on the brief, for appellee.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant, a Wisconsin corporation, brought suit in the District Court for the Eastern District of Michigan, asking that the Addison Manufacturing Company render an accounting and be required to pay damages arising out of a breach of contract whereby the Addison Company agreed to process, or manufacture, certain wheel trim discs out of aluminum furnished by appellant. Further, appellant asked that the Addison Company be required not only to pay damages resulting from breach of contract, but also to pay damages for conversion of appellant's property consisting of the aluminum in question. The Addison Company denied that it was guilty of any breach of contract or conversion, and further defended on the ground that appellant was a foreign corporation which had not been authorized to carry on business in the State of Michigan, and could not, according to Michigan law, prosecute such a suit in the courts of that state; and that it was likewise barred from enforcing such contractual rights in the federal court. Subsequent to the commencement of suit, the Addison Company was adjudicated bankrupt, and the trustee in bankruptcy was substituted as the party defendant. Both the Addison Company and the trustee will hereafter be referred to as the appellee.

The district court held that, through the agreement of the parties, title to the aluminum in question had passed from appellant to appellee; that there was no trust relationship between the parties; that title to the property having passed to appellee, appellant had no grounds upon which to base a claim of conversion; and that, because appellant had not been authorized to do business in the State of Michigan, it could not maintain an action based on a contract which was unlawful under state law.

In our determination, we have been obliged to resort to the transcript of testimony and the original papers on file because of the inadequacy of the portions of record contained in the appendices to the briefs, but overlook this failure to comply with the appendix rule, inasmuch as the briefs and appendices were filed shortly after the adoption of such rule.

As disclosed by the findings of fact which are amply sustained by the evidence, it is clear that appellant had not complied with the Michigan statute which requires that a foreign corporation procure a certificate of authority before it can lawfully carry on business in Michigan; and that its contracts with appellee were intrastate transactions, unenforceable in the state courts, or in a federal court in Michigan.

We come, then, to the question of the claimed conversion by the Addison Company of the aluminum which appellant furnished to the manufacturer of the discs. Appellant contends that even though it did not comply with the Michigan statute requiring it to procure a certificate of authority before it could lawfully carry on business in the state, nevertheless, it had the right to maintain a suit for wrongful conversion of the aluminum to which it had title and which it confided to the possession of the Addison Company for the manufacture of the discs in question; and that the proofs entitle it to a judgment against appellee for wrongful conversion. There could, of course, be no basis for a claim of conversion if title to the aluminum

had passed to the Addison Company; or if such aluminum had been wholly used up in manufacturing the discs which had thereafter been furnished to appellant or its customers.

The determination of this case rests entirely on the facts. It appears that on June 18, 1946, appellant purchased approximately 41,000 pounds of aluminum from the Milwaukee Stamping Company. The president of appellant company, who was its chief witness in the case, could not, or would not, tell how much appellant had paid for the aluminum, but other evidence indicated that the sum was $12,982.00. This included scrap aluminum, partially completed discs, and sheet aluminum. Three days after this purchase, on a Sunday, June 21, 1946, appellant company, without any prior consultation or business or contractual relationship with the Addison Company, brought by truck, from Wisconsin, to the latter's plant, in Michigan, a quantity of dies and a large amount of the aluminum, merely on the strength of a conversation with some promoter who, apparently, advised appellant's president that the Addison Company could do the manufacturing work contemplated by him. However, it was not until more than two weeks later, on July 8, that a contract was entered into between the two companies in the form of a written "purchase order." Appellant's president had arrived at the Addison Company's plant on the same day as the truckload of aluminum and immediately learned that the Addison Company did not have the proper equipment to do the processing work of stamping out the wheel discs. It was then agreed by appellant that the Addison Company would farm out the work to the Glenfield Machine & Tool Company in East Detroit, Michigan. The purchase order contract provided that Addison would arrange for the manufacture of 1850 partially processed wheel discs and recited that the aluminum had been received from appellant. It appears also to have been agreed that the Addison Company would arrange for the shipment of the completed discs to appellant's customers, and would bill them directly for a price specified by appellant. Out of the proceeds of the payments from such purchasers which were to be received by Addison, it was agreed that it would pay appellant 60 cents per disc.

When the work of manufacturing the discs was farmed out to the Glenfield Company, that company found that the dies were in bad condition and not suitable for the stamping work; they did not run true, and it was necessary to recondition them. This was done by the Glenfield Company, with the approval of appellant. The aluminum which had been removed from Addison's premises to the plant of the Glenfield Company for processing into wheel discs was thereafter used for this purpose; and several thousand discs were manufactured by the Glenfield Company and accepted by appellant. However, the aluminum furnished by appellant turned out to be old, hard aluminum, not of the right drawn quality, and unsuitable for stamping. As a result of the quality of the aluminum, breakages occurred in 25 per cent of the stampings. When the Glenfield Company called the attention of appellant's president to the fact that the aluminum was old, hard, and unsatisfactory for stamping, he replied that he knew it was old aluminum but that he had to buy what he could get and that if he had been able to secure the right kind of material, he would not have experienced the trouble he had. In spite of the fact that the president of the Glenfield Company told appellant's president of the shortcomings of the aluminum and that, in his opinion, the discs which appellant actually accepted were really unsatisfactory and defective, nevertheless, appellant, who was unable to secure any other aluminum—because it was not then available—told the Glenfield Company to go ahead and use up the material on hand for the making of the discs.

For reasons as obscure as are many of the other happenings in the case, it

was thereafter decided, either by the Addison Company, or appellant, or both, to remove all of the dies and the remaining stock of aluminum from the Glenfield Company and take it to the plant of the O. K. Stamping Company at Fort Wayne, Indiana, and have the latter company do the stamping work. However, the Glenfield Company had charges in the amount of $2,238.61 against appellant for reconditioning its dies, and a further charge for stamping operations in the amount of $2,000.00. To secure the dies, Addison advanced the sum of $2,238.61 on appellant's behalf by giving it a check for that amount, which appellant endorsed over for payment to the Glenfield Company; and the dies were, accordingly, surrendered to appellant company.

Appellant then entered into a new contract with Addison which provided that in consideration of Addison's advancing the money, appellant "assigns to (Addison) sufficient aluminum to cover this advance." The agreement also set forth: "It is further understood that $.60 received for each wheel sold shall be returned to (appellant) until such time as their present stock of aluminum is exhausted with the exception that the $2238.61 advanced shall be retired by our retaining the said $.60 until such time as we have received $2238.61." At the same time, appellant gave Addison a bill of sale to "approximately" 20,000 pounds of aluminum then located at the plant of the Glenfield Company; and the aluminum was thereafter secured and removed to the plant of the O. K. Stamping Company in Fort Wayne, Indiana.

On September 4, 1946, another agreement was entered into between appellant company and Addison for the manufacture of 25,000 sets of wheel discs. In this agreement, appellant contracted to pay Addison the sum of $1.42 for each of the discs manufactured; and it was agreed that all material and dies for the order "are the property of the Krueger Corporation and as remittances are received for shipped wheels, a credit will be issued to the Krueger Corporation for the price of the material used in the wheel." The evidence is not clear on the point, but it seems that the amount to which appellant would be entitled out of the remittances from customers, or for which it would be given credit, was 60 cents per wheel. The contract further provided that Addison assumed no responsibility "as to stampings made from these dies that do not pass the inspection of the purchaser."

On September 20, 1946, another agreement was entered into between appellant and the Addison Company. At that time, the stamping work had, with appellant's consent, been farmed out to the O. K. Stamping Company at Fort Wayne, Indiana. The new agreement, evidenced by a letter to appellant confirming a conversation between several of its representatives and the Addison Company, set forth explicitly that all shipments to appellant's customers in the future were to be invoiced to the Milwaukee Oil Corporation, accompanied by bills of lading, for the account of appellant; that defective wheel discs would be replaced by Addison, but merchandise rejected for other reasons would remain appellant's property; and that the proceeds from approximately 30,000 pounds of aluminum which appellant then owned would remain in Addison's possession, "as a revolving fund," to constitute capital to finance further purchases of aluminum to meet the requirements of manufacturing the wheel discs. The evidence is clear that although appellant had this large quantity of aluminum and left it in Addison's hands, Addison refused to consider the aluminum as any security for payment of the cost of its manufacturing operations, and declined to extend appellant any credit whatever, insisting, before manufacture and shipment of the discs to appellant's customers, that the Midland Investment Company of Milwaukee guarantee the payment of, and pay Addison directly for all discs shipped.

During the course of the dealings between appellant and Addison, many of the discs were rejected and returned by

customers. It appears that after the discs were stamped out of the aluminum, they were returned to Addison for buffing and painting, and many of those afterward rejected and returned to Addison by appellant's customers were because of the fact that the paint had started to crack and peel. The proofs were to the effect that the paint cracked and peeled because the surface of the disc had not been smoothly buffed. However, both the president of the Glenfield Company and the president of Addison testified that, because of the quality of the aluminum used, there were cracks, scratches, and wrinkles in the discs after stamping; and Addison's president testified that it was because of this fact that the buffing could not be done in such a way as to make a surface smooth enough to enable the paint to adhere to it. He further testified that appellant's president and his wife came over to the plant in Michigan and did a lot of the buffing themselves; that at that time he told appellant's president that the discs would not be acceptable to him, if he were a buyer, and that he didn't think anyone would accept them; but that appellant's president assured him that his customers would accept them and they were, accordingly, shipped out on his request. The district court found that from time to time after the discs had first been manufactured, appellant's president had accepted delivery of them prior to their shipment to customers.

The district court found that appellant, in consideration of the advance of $2,238.61 to the Glenfield Company, had transferred to Addison, by the bill of sale of August 22, 1946, title to all of the aluminum which it then had at the premises of the Glenfield Company aggregating approximately 20,000 pounds, and that it was the intention of the parties that title to the aluminum was to and did pass to Addison, and that Addison was to pay appellant 60 cents per completed disc in payment of the aluminum. Counsel for appellant submits that it is unreasonable to conclude that a payment of $2,238.61 represents the consideration for title to appellant's 20,-000 pounds of aluminum, especially since the evidence discloses that, more than four months later, Addison was billing appellant for the money which it advanced.

Appellant claims that title to the aluminum furnished to the Addison Company never passed to that company; and that its refusal to return the aluminum, or its sale thereof for its own purposes, constituted conversion. In support of its contention, appellant submits that the bill of sale, which the court held passed title, was given only for security, and must be read in connection with the parties' agreement of the same day which set forth that appellant "assigns to us sufficient aluminum to cover this advance," together with the stipulation that the proceeds payable to appellant would be retained by Addison until the advance was repaid. This would seem persuasive except for the testimony of the president of appellant company who emphatically and repeatedly denied that the bill of sale was given for security but contended, on the other hand, that it was only executed for the purpose of enabling Mr. Hickory, the president of the Addison Company, to replevy from the Glenfield Company aluminum which in reality belonged to appellant but which it could not secure without payment of appellant's outstanding account with the Glenfield Company amounting to $2,000.00. Moreover, to add to the confusion of the contentions advanced, appellant's counsel, on the trial, objected to the introduction in evidence of an order by appellant's president to the Glenfield Company to recondition the dies, "on the ground that it was a part of Mr. Hickory's plan to fraudulently pass the blame on to (appellant) for the difficulties of Glenfield Machine & Tool Works, as a means of allowing him to get the aluminum out of there, which he did later; for that reason I object to the exhibit, because it is self serving as a part of Mr. Hickory's fraud on The Krueger Corporation. * * *" What the truth is, in this instance, is problematical.

It is to be said that although Addison claims that it received title to appellant's aluminum then on hand by virtue of the bill of sale of August 22, 1946, and although the trial court found that title thereby passed to Addison in consideration of the latter's advance of the money to the Glenfield Company, still the fact is that Addison was billing appellant for this advance several months later. Moreover, on September 25, 1946, in an agreement between appellant and Addison, it was recited that the aluminum then in Addison's possession belonged to appellant. And these circumstances tend to negative the conclusion that title to this aluminum had passed to Addison, and that the consideration for the bill of sale was the advance of money for which appellant was later being billed. Nevertheless, unless fraud were established, or proofs introduced that sustained the conclusion that the bill of sale was given for security only—which was not done in this case—it would appear that the district court's findings that title had passed with the execution of the bill of sale, were not clearly erroneous, and should, therefore, be sustained. But whatever the inconsistencies with regard to the question of the passing of title by bill of sale, they are not of controlling importance in the disposition of this case, for the claimed conversion of the aluminum by the Addison Company is belied by a further and paramount consideration: It was agreed in writing between appellant and Addison that the proceeds from all the aluminum which appellant owned on September 25, 1946—including the share of 60 cents per wheel that would be payable to appellant—should remain in Addison's possession to constitute a fund for working capital to finance the purchase of additional aluminum to meet future manufacturing requirements; and counsel for appellant learned with what must have been considerable surprise, when he asked the president of the Addison Company on cross-examination whether that company had ever placed a cent of these proceeds in a fund for the purchase of aluminum, that the Addison Company had actually placed $10,000.00 of its own money in such a fund, and had used it to purchase a carload of aluminum which was thereafter shipped to the O. K. Stamping Company to carry out the manufacturing operations in order to supply appellant's customers with the discs. Moreover, it appears that all of the aluminum that had belonged to appellant on September 25, 1946, had been used up in manufacturing discs. Addison, therefore, could not have been guilty of a conversion of that aluminum; and no further aluminum was afterward shipped by appellant on any of the transactions here involved.

In January 1947, Addison sent a notice to appellant that it was going to dispose of merchandise which it had manufactured for appellant unless appellant paid for such property and removed it from the plant of the Addison Company. It was testified by Addison that from October 1946 on, the dies having been reconditioned, the discs were being satisfactorily manufactured, but that the price specified by appellant for sale to its customers was too high, and that the discs could not be sold at such price, and were piling up on the premises of the manufacturer.

At that time, Addison had not been repaid, nor was it ever repaid, by appellant for the expenditure of $2,238.61 which it had advanced on appellant's behalf to recover its dies from the Glenfield Company. The president of appellant company testified that appellant did not owe this amount to Addison inasmuch as it was their agreement that Addison was to take that amount of money out of aluminum which had been shipped to it. If Addison had aluminum or merchandise belonging to appellant in January 1947 of the value, or less than the value, of $2,238.61, the retention or sale of such aluminum by Addison, under appellant's theory, could not be a conversion as Addison would have a right to this aluminum—even though it had belonged to appellant—up to the value above mentioned.

In no event, however, does the evidence disclose that Addison was guilty of a conversion of appellant's aluminum. Even if it be assumed that no title passed to Addison by virtue of the bill of sale executed by appellant on August 22, 1946, and that the transaction was only security for a loan—contrary to the testimony of appellant's president—nevertheless, all the aluminum covered by that bill of sale was used up in manufacturing discs in accordance with Addison's agreement with appellant. Evidence introduced on behalf of both parties shows that, after the aluminum shipped by appellant had been used up in manufacturing discs, it was understood that future purchases of aluminum for the manufacturing processes would be made by Addison; and there is nothing in the evidence, express or implicit, that gives rise to any inference that the parties intended that after the aluminum owned by appellant had been used up in the manufacturing operations, title to the aluminum thereafter purchased by Addison out of the so-called revolving fund should reside in appellant. For appellant's president testified that after the aluminum furnished by him was consumed, "they (the Addison Company) were supposed to buy the material after that was finished;" that arrangements to secure additional aluminum, after the original shipment was exhausted, "were up to" Addison's president, Mr. Hickory; that he was to furnish such material; and Mr. Hickory testified that when the aluminum furnished by appellant had been used up, Addison bought the new aluminum with its own money.

Aside from the foregoing, it may be remarked that in many instances, the proofs necessary to sustain a claim of conversion in this case are cloudy and inadequate. Appellant's president, as above mentioned, either could not, or would not, testify how much he had paid for the aluminum which he had purchased from the Milwaukee Stamping Company and had shipped to Addison. While we have in mind the insistence of appellant's counsel that they were entitled to prove the value of the aluminum by proof of the market value at the time of its shipment, the failure or refusal of appellant's chief witness, when asked on cross-examination, to testify as to what he actually paid for it, weakened appellant's case at the very outset of the proofs, especially since it afterward appeared that the aluminum was old and unsuitable for the stamping operations in question, and had been purchased by appellant because no other quality was then available. Moreover, although appellant received, or had available, copies of invoices for all discs manufactured and shipped, there was no proof on the part of appellant as to the number of discs shipped; how many were rejected by customers; and how many were returned to Addison. It does, however, appear that when one customer rejected a certain shipment, appellant secured the shipment in Milwaukee and stored and kept it for its own purposes without giving credit to Addison therefor. It also appeared that not all of the aluminum purchased from the Milwaukee Stamping Company by appellant was shipped to Addison, an unspecified amount being retained by appellant as scrap aluminum; and in its general and vague claims against Addison, no credit was given for the aluminum which had been processed by the Glenfield Company, amounting to approximately 9,000 discs, together with 25 per cent breakage due to the deficient quality of the aluminum. In addition, any claim that Addison was to blame for the rejection, by customers, of the discs because of defective stamping, buffing, and painting, was overcome by clear and convincing evidence, on the part of the Glenfield Company and the Addison Company, that such defects arose out of the quality of aluminum furnished by appellant, and that appellant was told of this fact at the commencement of the stamping operations. But, as remarked above, apart from the foregoing consideration respecting inadequacy of proof, appellant could not recover.

Neither the claims of fraud, here alleged but not proved, nor claims arising out of a breach of contract, would enable appellant to prevail in this suit, for the action upon which appellant depends is in the nature of trover for conversion; and the proofs are not sufficient to sustain a wrongful conversion of appellant's property.

In consideration of the foregoing, the judgment of the district court is affirmed.